## AVERILL v. COMMISSIONER OF INTERNAL REVENUE.

### No. 3376.

Circuit Court of Appeals, First Circuit.
Dec. 28, 1938.

Leonard A. Pierce, of Portland, Me. (Cook, Hutchinson, Pierce & Connell, of Portland, Me., and Carroll N. Perkins and Perkins & Weeks, all of Waterville, Me., on the brief), for petitioner.

Joseph M. Jones, Sp. Asst. to the Atty. Gen. (James W. Morris, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to the Atty. Gen., on the brief), for the Commissioner.

Before BINGHAM and WILSON, Circuit Judges, and McLELLAN, District Judge.

McLELLAN, District Judge.

This petition to review a decision of the Board of Tax Appeals presents the question whether the gain realized by the petitioner when bonds owned by her were paid at maturity in 1931 should be taxed as ordinary income. The Board decided that such gain should be taxed as ordinary income; the petitioner urges that it should be taxed as capital gain at the maximum rate of 12½ per cent. The Board erred and the petitioner should prevail:

1. If a transaction in 1927 in which she parted with some stock and received cash and bonds was a sale for a price payable by installments and not as to her a statutory reorganization; or

2. If, though the 1927 transaction was not a sale, the 1931 surrender of her bonds then maturing for which she received payment was a "sale or exchange" within the meaning of the Revenue Act of 1928.

The reason the petitioner should prevail if she sold her stock in 1927 is that the rights of the parties would then be governed by a statute permitting the taxpayer who sells or otherwise disposes of property on the installment plan to return as income in any taxable year that portion of the installment payments actually received in that year which the total profit realized or to be realized when the payment is completed bears to the total contract price (Revenue Act of 1926, Section 212(d), 44 Stat. 23), and by a statute giving the taxpayer in case of a capital net gain an election to pay a 12½ per cent tax thereon (Revenue Act of 1928, Section 101(a), 26 U.S.C.A. § 101). The reason the petitioner should prevail if the transaction by which she gave up her bonds and received payment therefor in 1931 constituted a sale or exchange of the bonds is that in such a case the statute last cited gives the taxpayer an option to pay a 12½ per cent tax on a capital gain, which Section 101(c) of the Revenue Act of 1928, 26 U.S.C.A. § 101, defines as a "taxable gain from the sale or exchange of capital assets."

We proceed to state the facts material to these two questions.

For more than two years prior to January 1, 1927, the petitioner had owned 1,500 shares of the common stock of Keyes Fiber Company, hereafter sometimes called the old company. This corporation at all times here material had outstanding but one issue of stock,—its common stock, of which there were 6,000 shares.

On July 27, 1927, the petitioner, her husband George S. Averill and other shareholders representing in all 5,912 shares, entered into a contract with the Rex Pulp Products Company, hereinafter called Rex. In this contract the shareholders of the old company, referred to therein as "the vendors," agreed to "sell, assign and convey all the shares owned by them to a new corporation to be organized under the laws of Maine, hereinafter known as the vendee, to be called Keyes Fiber Company, Inc., or some similar name, at the agreed purchase price of seven hundred fifty (750) dollars per share." Rex agreed "that it will cause the vendee to pay to each of said vendors on or before the 11th day of August, 1927, at the Fidelity Trust Company, Portland, Maine, for the number of shares of stock

in said company which said vendors shall properly deliver to the order of the vendee at the Fidelity Trust Company, Portland, Maine, the sum of seven hundred fifty (750) dollars per share." Rex also agreed that "such payments shall be made as follows, viz: 5/9 (five ninths) of the purchase price for said shares shall be paid in the first mortgage bonds of the vendee and the remaining 4/9 (four ninths) of such price shall be paid in cash." It was further agreed that the proportion of bonds and cash paid to the individual vendors should be as agreed upon among themselves. The contract provided in substance that the first mortgage bonds should constitute a first lien on all the property "now or hereafter acquired" by either the old company, or Rex, or the corporation to be organized.

Later, Keyes Fiber Company, Inc., hereafter sometimes called the new company, was organized. On August 11, 1927, certain corporate votes were passed by the old company, Rex, and the new company. The new company first acquired all the assets of Rex in exchange for its own common stock. It then assumed those obligations which the contract of July 27 provided that it should assume, and voted to purchase the 5,912 shares of the old company as provided in the contract. The stock of the old company was then assigned to the new company, which immediately pledged it to a trustee as security for the performance of its obligations under the contract. The old company then conveyed all its assets to the new company for the agreed price of $4,500,000, and this sum was paid to it by the new company, 4/9ths in cash and 5/9ths in bonds. The old company then made a liquidating dividend to its stockholders of $750 a share, 4/9ths in cash and 5/9ths in bonds, and was later dissolved. This dividend was received by the new company as holder of the stock of the old company, and was immediately transferred to the former stockholders of the old company in exchange for their stock, in accordance with the terms of the contract of July 27 and of the pledge to the trustee. While, as heretofore stated, the contract of July 27, 1927 provided that the purchase price of the stock should be paid 5/9ths in bonds of the vendee and 4/9ths in cash, there was a provision that "the proportion of payment of bonds and cash should be such as is agreed upon among said vendors." Accordingly, the petitioner received $275,000 cash, which was just less than 25 percent of the purchase price, and $850,000 in serial bonds which were of the par value of $1,000 cash and worth par when received in 1927. One tenth of the petitioner's 850 bonds matured in each of the years 1931 to 1936 inclusive and four tenths in 1937.

At all material times up to August 11, 1927, the date on which the petitioner disposed of her stock in the old company, her husband, Dr. George G. Averill, was a large stockholder, a director, treasurer and clerk of the old company. The petitioner held no office in the old company. Neither Dr. nor Mrs. Averill held any office in Rex Pulp Products Company or the new company at any time, nor did either of them hold any office in the old company at any time after the petitioner disposed of her stock. Thus it appears that so far as the petitioner is concerned all she did was to transfer her stock in the old company for cash and serial bonds of the transferee.

As heretofore indicated, the first question is whether the transaction in 1927 was tantamount to a sale by the taxpayer of her corporate stock for a price to be paid in installments.

The Board decided and the Commissioner contends that it was not a sale but an exchange by a party to a reorganization of stock in a corporation for securities in another corporation in pursuance of the plan of reorganization. Some of the essentials of a statutory reorganization inhered in what was done in 1927. These we think it unnecessary to discuss in detail. That the corporate bonds may be deemed "securities" within the meaning of the reorganization provisions of the statute, Revenue Act 1926, § 203(b) (2), (d) (1), (h) (1), 44 Stat. 12, is settled by Helvering v. Watts, 296 U.S. 387, 56 S.Ct. 275, 80 L.Ed. 289, where the Supreme Court said [page 276]: "The bonds, we think, were securities within the definition, and cannot be regarded as cash, as were the short-term notes referred to in Pinellas Ice and Cold Storage Company v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L. Ed. 428." The decision that the bonds there involved "were securities within the definition, and cannot be regarded as cash" is referable to a contract where no sale but only an exchange for stock and bonds was intended. An inspection of the contract in that case, appearing in 28 B.T.A. 1056, shows that the parties contemplated no sale, but only an exchange of stock for

stock and bonds. Consistent with the rest of the contract are the clauses reading:

"Whereas, said Parker Sloane is exchanging and delivering to and with the Vanadium Corporation of America Thirty Thousand (30,000) shares of the stock of the United States Ferro Alloys Corporation, * * * and

"Whereas, the Vanadium Corporation of America is exchanging and delivering to said Parker Sloane, Trustee for the owners of said United States Ferro Alloys Corporation" (certain shares of stock together with certain bonds).

We understand the Watts Case as holding that bonds may be deemed securities, and that if treated as such, they cannot be regarded as cash. It does not indicate that where, as in the case at bar, a person expresses his intention to sell and another to buy corporate stock and both parties contemplate a sale for a price payable by installments, that the transaction loses its character as such just because the vendee's obligation is represented in part by serial bonds. Neither does the Watts Case nor, so far as we know, any other decision of the Supreme Court of the United States, decide that the ownership of bonds without stock ever constitutes such a continuing interest as is essential to a statutory reorganization, a question which we are not called upon to decide. Cf. Worcester Salt Company v. Commissioner, 2 Cir., 75 F.2d 251, and Lilienthal v. Commissioner, 9 Cir., 80 F.2d 411.

■ The instant case discloses that the taxpayer contracted to sell her stock at $750 a share and the new corporation undertook to buy it at that price. The total price was to be paid, as to about 25 per cent thereof, in cash and the balance over a period of years. The petitioner's husband then relinquished his connections with the old company and had nothing to do with the management of the new one. Both intended to get out of the business and the new company intended that they should. The substance of the transaction was a sale by installments and the serial bonds were treated merely as a convenient method of providing for the installment payments. We see no adequate reason for saying that the intention of the parties should not be given effect. As to the taxpayer, the transaction amounted to a sale of her stock, not an exchange "by a party to a reorganization of stock in a corporation for securities in another corporation, a party to the reorganization, in pursuance of the plan of reorganization."

As before stated the taxpayer sold her stock in 1927 for a price payable in installments. Within the meaning of the statute she did not exchange it for securities in another corporation. The sale was casual, the purchase price exceeded $1,000 and the initial payment received in cash other than evidences of indebtedness of the purchaser during the year in which the sale was made and did not exceed one-quarter of the purchase price. In short, the transaction was within Section 212 of the Revenue Act of 1926, 44 Stat. 23, which permits the return in any taxable year of "that proportion of the installment payments actually received in that year, which the total profit realized or to be realized when the payment is completed, bears to the total contract price."

In her tax return for 1927 the petitioner reported gains from the disposition of her stock upon the installment basis and upon that basis her income tax for that year was paid. The Commissioner made no adjustment of the tax as to the petitioner, though he "disallowed the use of the installment basis as to Dr. George G. Averill and computed the gain under the reorganization exchange provisions." In the position then taken by the taxpayer she was right. Collection of the serial bonds falling due in 1931, with which we are here concerned, involved a net gain which, by virtue of Section 101 of the Revenue Act of 1928, 26 U.S.C.A. § 101, is taxable at 12½ per cent.

■ We now come to a different question. If the 1927 transaction were governed by the statutory reorganization provisions, it would not follow necessarily that the Board's decision is correct. When in 1931 the taxpayer surrendered her bonds then maturing and received payment therefor, she realized a gain over their stipulated cost. Her right to treat this profit as a capital gain taxable at the rate of 12½ per cent depends upon the portions of the Revenue Act of 1928 which follows:

"§ 101. Capital net gains and losses.

"(a) Tax in Case of Capital Net Gain. In the case of any taxpayer, other than a corporation, who for any taxable year derives a capital net gain (as hereinafter defined in this section), there shall, at the election of the taxpayer, be levied, collected, and paid, in lieu of all other taxes imposed by this title, a tax determined as follows: A partial tax shall first be com-

puted upon the basis of the ordinary net income at the rates and in the manner as if this section had not been enacted and the total tax shall be this amount plus 12½ per centum of the capital net gain. * * *

"(c) Definitions. For the purposes of this title—

"(1) 'Capital gain' means taxable gain from the sale or exchange of capital assets. * * * * * * *

"(7) 'Ordinary net income' means the net income, computed in accordance with the provisions of this title, after excluding all items of capital gain, capital loss, and capital deductions.

"(8) 'Capital assets' means property held by the taxpayer for more than two years * * *." 26 U.S.C.A. § 101.

■ At the outset we are confronted with the question whether it is so clear that the words "taxable gain from the sale or exchange of capital assets" do not include a transaction whereby bonds are redeemed at maturity that we are not permitted to use the canons of interpretation commonly used where the question is fairly debatable. If it were true that in the very nature of things a covenantee cannot sell a bond or other specialty to the covenantor, this would tend to support the Board's decision. But we think the holder can sell the bond to anybody. The incidents of such sales vary. If the bond is sold to a stranger, he gets it and with it the right to enforce it. If an attempted sale is made to the covenantor, he gets the bond though he acquires no right to enforce it. Perhaps one way to put it is that in either case there is a sale or transfer of title for a price,— that in one case the subject matter of the sale is the bond as a valid obligation, and that in the other case the subject matter of the sale is the bond as something calculated no longer to represent contractual rights. It makes no difference whether the transaction is regarded as the sale of a contract right to a stranger or as a sale of a "piece of paper" to the covenantor. In either case the original holder may be regarded as having realized a gain from the sale of a specialty.

In prior decisions and in the case at bar the Board adheres to the view that preferred stock may be sold to the corporation which issued it. Helvering v. Schoellkopf, 100 F.2d 415, recently decided by the Second Circuit, indicates that within the meaning of the reorganization statute a corporation's own shares cannot be regarded as

"property acquired" by it. But we find nothing there requiring the conclusion that a bond, particularly in a state where the distinction between sealed and unsealed instruments has not been abolished, cannot be sold to its maker.

Moreover, a transaction whereby a holder surrenders his bond and receives payment thereof or therefor has commonly been called a redemption, which derivatively and according to the dictionaries, and Judge Wilson's opinion while Chief Justice of the Maine Supreme Court, is a repurchase. Bernstein v. Blumenthal, 127 Me. 393, 396, 143 A. 698.

We think the proper construction of the words "taxable gain from the sale or exchange of capital assets" sufficiently debatable to warrant a brief reference to the history of this clause of the statute.

The first legislation according special treatment to capital gains is in the Revenue Act of 1921. 42 Stat. 232, § 206. There the definition of capital gain as "taxable gain from the sale or exchange of capital assets" first appeared. It reappeared in the intervening Acts and that of 1932. Revenue Act 1924, § 208, 43 Stat. 262; Revenue Act 1926, § 208, 44 Stat. 19; Revenue Act 1928, § 101, 26 U.S.C.A. § 101; Revenue Act 1932, § 101, 26 U.S.C.A. § 101. Referring to the purpose of the Congress in passing the Revenue Act of 1921, the Supreme Court of the United States in Burnet v. Harmel, 287 U.S. 103, 106, 53 S.Ct. 74, 75, 77 L.Ed. 199, said:

"* * * The provisions of the 1921 Revenue Act for taxing capital gains at a lower rate, re-enacted in 1924 without material change, were adopted to relieve the taxpayer from these excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions."

Prior to the Revenue Act of 1928, here applicable, the practice had been to treat gains incident to the redemption of bonds as ordinary income. The tendency of the use of the same language in the 1928 Act was to indicate a congressional intent to the same effect. But after the 1928 Act was passed there was a series of events pointing another way.

■ In Werner v. Commissioner, 15 B.T.A. 482, the Board of Tax Appeals in 1929 recited the legislative history of the statutory definition now under consideration and concluded that the redemption of

"called" bonds constituted a "sale or exchange." It may be stated parenthetically that no importance was attributed to the fact that the bonds were "called" and we do not see how that fact is of consequence. After this decision by the Board, the Commissioner in IT: 2488 (2 C. B. 127) revoked his previous ruling and directed that the net gains from bonds held for more than two years received as a result of the maturity of the bonds or as a result of their redemption before maturity may, at the option of the taxpayer, other than a corporation, be taxed under the capital gains section of the Revenue Act of 1921. This ruling was also made applicable to the Revenue Acts of 1924, 1926, and 1928. As stated in the petitioner's brief, "thus, from 1929 until December 1932, the ruling of the administrative department of the Government in charge of the collection of income taxes, as well as the ruling of the Board, interpreted the statute in accord with the petitioner's contention." In the light of this interpretation, Congress in 1932 reenacted its definition of "capital gain" in precisely the same language. Unless the Werner Case was plainly erroneous, and we do not think it was, this reenactment of the statute might well be considered as a satisfactory interpretation of the legislative intent. Buttolph v. Commissioner, 7 Cir. 1928, 29 F.2d 695. See also Hassett v. Welch, 303 U.S. 303, 58 S.Ct. 559, 82 L. Ed. 858.

On December 29, 1932, the Board of Tax Appeals reversed the Werner decision (Watson v. Commissioner, 27 B.T.A. 463). Thereafter, as shown in a publication of the Government Printing Office entitled "Revenue Revision, 1934, Hearing before the Committee on Ways and Means, House of Representatives, 73d Congress, Second Session, December 15 to 21, 1933 and January 9 to 11, 1934," the American Bar Association recommended that the Congress re-define the terms "capital gain" and "capital loss" to make clear whether such terms include gains and losses resulting from the redemption at maturity of capital assets. In the Revenue Act of 1934 it was provided:

"Sec. 117 [§ 101]. Capital gains and losses.

"(a) General Rule. In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income: [there follows a statement as to the percentages]." 26 U.S.C.A. § 101(a).

In sub-division (f) of the same section it was provided that "for the purposes of this title, amounts received by the holder upon the retirement of bonds, debentures, notes, or certificates or other evidences of indebtedness issued by any corporation * * * shall be considered as amounts received in exchange therefor." 26 U.S.C. A. § 101(f).

There seem to us two admissible views as to the bearing of this legislation, one that it constitutes a legislative declaration of the meaning of the word "exchange" and governs the construction of the word in prior Acts, the other the view expressed by the Circuit Court of Appeals for the 9th Circuit in the following language:

"When Congress determined, as it did in 1934, to treat as 'capital gains' gains resulting from the retirement of bonds issued by a government or corporation, it had no difficulty in expressing its intent in clear and unambiguous language. Revenue Act of 1934, § 117(f), 48 Stat. 715, 26 U.S.C.A. § 101(f). If such intent had existed prior to 1934, it could and, we think, would have found similar expression." United States v. Fairbanks, 95 F. 2d 794, 796.

Though the question seems to us a close one, we think under all the circumstances that the doctrine enunciated by Chief Justice Marshall in Alexander v. The Mayor of Alexandria, 5 Cranch 1, 3 L.Ed. 19, is here relevant. He there said [page 7]:

"Without deciding this question as depending merely on the original law, it is to be observed that acts in pari materia are to be construed together as forming one act. If in a subsequent clause of the same act provisions are introduced which show the sense in which the legislature employed doubtful phrases previously used, that sense is to be adopted in construing those phrases. Consequently, if a subsequent act on the same subject affords complete demonstration of the legislative sense of its own language, the rule which has been stated, requiring that the subsequent should be incorporated into the foregoing act, is a direction to courts in expounding the provisions of the law."

This language is quoted in full in this court's opinion in Panther Rubber Co. v.

Commissioner, 1 Cir., 45 F.2d 314, where Judge Wilson also said [page 315]:

"Congress, by substitute provisions, in pari materia with section 250 of the Revenue Act of 1921 [42 Stat. 264], has indicated that such was its intent, and has made it clear in the act of 1924 and especially in the Revenue Act of 1928. In the Revenue Act of 1924,.§ 278(c) [43 Stat. 300] Congress provided that assessment and collection may be had after the expiration of the statutory period, where the taxpayer and commissioner 'have consented,' indicating a past act. This might not be conclusive, but Congress in the Revenue Act of 1928 clearly indicated its intent (see chapter 852, § 276 [26 U.S.C.A. § 276]), and required the waiver to be signed before the limitation period for assessing the tax expired."

See, also, Old Colony Trust Company v. Malley, 1 Cir., 19 F.2d 346.

We think the taxpayer's 1931 gain not taxable as ordinary income, but as capital gain at the maximum rate of 12½ per cent because the 1927 transaction was a sale for a price payable in installments not affected by the reorganization provisions of the statute, and because, if this is not so, the redemption of her bonds in 1931 resulted in a "capital gain" within the meaning of the statutory definition of that term.

The decision or order of the Board of Tax Appeals is reversed and the case is remanded to that Board for further proceedings not inconsistent with this opinion.