**YATES v. McGOWAN, United States Collector of Internal Revenue.**

No. 2012 A.

District Court, W. D. New York.

May 15, 1941.

O'Brian, Hellings, Ulsh & Morey, of Buffalo, N. Y. (Ralph Ulsh and William I. Morey, both of Buffalo, N. Y., of counsel), for plaintiff.

Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe and Paul R. Russell, Sp. Assts. to the Atty. Gen., and George L. Grobe, U. S. Atty., and R. Norman Kirchgraber, Asst. U. S. Atty., both of Buffalo, N. Y., for defendant.

KNIGHT, District Judge.

It has been stipulated that the issues of law and fact herein be determined by this court. The action is brought, as authorized by Section 24, subd. 5 of the Judicial Code and Judiciary, 28 U.S.C.A. § 41, subd. 5, to recover taxes assessed and collected from the plaintiff by the defendant under the provisions of the Internal Revenue Act of May 29, 1928, Chap. 852, 45 Stat. 791–883, Section 101, 26 U.S.C.A. Int.Rev.Acts, page 370.

In and prior to October, 1927, the plaintiff owned 11,915 shares of stock of the Buffalo Union Furnace Company (hereinafter called Union), a corporation of the State of New York, having a par value of $100 a share. Part of this had been purchased by him and part received as dividends upon the shares so purchased. All of the stock had been held by the plaintiff more than two years prior to the aforesaid date. The Union company was re-organized pursuant to plan therefor dated October 1, 1927. In pursuance of this plan the stockholders of the Union company received in exchange for each share of $100 par value common stock in said corporation three-fifths share of common stock without par value and bonds of par or face value of $90 in said re-organized corporation. Plaintiff received for his 11,915 shares aforesaid 7,149 shares without par value of the common stock and 1,072.35 mortgage bonds, each of the par value of $1,000 in the re-organized company.

The Union company by the terms of the consolidated mortgage securing said bonds agreed to retire the bonds so secured to the amount of $112,500 principal per annum and reserved the right to pay or redeem any part thereof in excess of $112,500 per annum "on any interest day upon 30 days' notice at 105% of par, plus accrued interest up to and including October 1, 1930; 104% at par plus accrued interest during the year 1931; 103% par plus accrued interest during 1932, and 102% plus accrued interest during the remainder of the life of said bonds." The total amount par value of the bonds secured was $4,-500,000.

In January, 1928, all of the stockholders of the Union company sold their stock in that corporation to the M. A. Hanna Company, and the M. A. Hanna Company, prior to November 1, 1929, sold such shares to its

subsidiary, Hanna Furnace Corporation. On or about December 1, 1929, National Steel Corporation acquired from the M. A. Hanna Company the stock of the Hanna Iron Ore Company, which then owned the stock of the Hanna Furnace Corporation, which in turn owned the stock of the Union Furnace Company. In May, 1930, the name of the Buffalo Union Furnace Company was changed to Hanna Furnace Company (New York).

On or about July 24, 1930, the Commissioner of Internal Revenue, upon the audit of plaintiff's income tax return for 1928, determined that the cost of the original stock held by the plaintiff in the Buffalo Union Furnace Company, at the time of its re-organization, should be allocated to the new stock and bonds received in exchange by the plaintiff as aforesaid and allocated to the plaintiff's new stock a cost of $18.53256 per share and to his bonds a cost of $205.91748 per $1,000 bond. For the purpose of making such allocation, the Commissioner placed the market value of the stock at $90 per share and the bonds at $1,000. He then held that the gain on the stock and bonds in the reorganized company sold by the plaintiff in 1928 were capital gain, and further that any profit realized through the retirement of plaintiff's bonds was taxable as capital gain.

In accordance with the provision of the aforesaid consolidated mortgage indenture, Hanna Furnace Corporation in August, 1930, called by lot at par 109 of the Buffalo Union Furnace Company bonds, including $30,000 par value of said bonds owned by the plaintiff. On October 1, 1930, the plaintiff surrendered and delivered the aforesaid bonds, and he was paid therefor $30,000.

On or about April 9, 1931, National Steel Corporation entered into an agreement with the Manufacturers & Traders Trust Company of Buffalo, the trustee under the consolidated mortgage indenture aforesaid, for the deposit with said Trust Company of an amount in cash sufficient to pay the bondholders of two-thirds of the bonds of the Union company then outstanding, with accrued interest, and also a sufficient amount in cash to pay the remaining outstanding bonds with interest to October 1, 1931, and for the release therefrom by the Trust Company of the consolidated mortgage aforesaid together with a mortgage supplemental thereto.

This arrangement was entered into at this time in order that the National Steel Corporation might give a mortgage covering the properties of the then Hanna Corporation (New York) as security in part for $40,000,000 issue of bonds then about to be executed by the National Steel Corporation. On April 10, 1931, the plaintiff joined in a notice sent to other bondholders stating that he had consented to the redemption of the bonds held by him and advising them as to the course to be taken by them in agreeing to a redemption.

On April 17, 1931, the National Steel Corporation acquired all the outstanding stock of the Hanna Furnace Corporation (New York) and on the same day the Board of Directors of the National Steel Corporation adopted a resolution calling for the redemption of all of the outstanding bonds of the Union company as provided in the consolidated mortgage indenture and authorizing the Treasurer of the company "to redeem, retire and to pay the same by depositing with the trustee such amount as is necessary for that purpose." On the same day, a resolution was adopted by the Board of Directors of the Hanna Furnace Corporation, authorizing the Treasurer of that company "to redeem and retire said bonds by depositing with the Trustee such amounts necessary for that purpose and to do any and all things necessary and proper to redeem and retire said bonds and to obtain release of said mortgage."

On or about April 22, 1931, the plaintiff deposited with the Trust Company aforesaid 1,004 Buffalo Union Furnace Company bonds and took a receipt for such deposit from said Trust Company. In the months of April (commencing the 22d), May, June, July, August and September, 1931, the Hanna Furnace Company caused to be published a Notice of Redemption of the said Union company bonds, in part providing that "it is exercising the right so reserved to pay and redeem, and will pay and redeem on October 1, 1931, all of its consolidated mortgage 6% 20 year gold bonds * * * securing a total authorized issue of $4,500,000." On April 22, 1931, 4,652 of the Buffalo Union Furnace Company bonds were outstanding. On that date the National Steel Corporation, Hanna Furnace Corporation and the Manufacturers & Traders Trust Company made a supplementary agreement for the redemption of the outstanding bonds. On April 28, 1931,

in pursuance of the agreement, the National Steel Corporation paid to the Trust Company the sum of $4,317,796, being 104% of the par value of the 4,110 Buffalo Union Furnace Company consolidated mortgage bonds, with accrued interest to April 28, 1931, on 3,128 of said bonds theretofore deposited with said Trust Company and interest to October 1, 1931, on 982 bonds not deposited. Included in said 3,128 were the bonds of the plaintiff. The Trust Company delivered to the National Steel a satisfaction and discharge of the consolidated mortgage. National Steel Corporation charged the Hanna Furnace Corporation (New York) with the sum of $4,162,000, being par value of the Buffalo Union Furnace Company bonds then outstanding and interest paid. The Steel Company charged $166,480 balance of the money paid on the bonds to its own surplus account. On April 28, 1931, the Trust Company credited the sum of $1,048,678 to the plaintiff's checking account. This was in sum of $1,044,160 on account of said bonds and $4,518 on account of interest to April 28, 1931. Plaintiff then surrendered his trust receipt evidence of deposit of bonds. From time to time subsequent to April, 1931, and prior to October, 1931, various holders of the stock delivered bonds to the Trust Company and received payment at rate fixed, and all of the bonds were delivered to the Trust Company and paid by October 1, 1931.

The plaintiff made return for income for years 1930 and 1931 and paid the Collector $8,324.36 for the year 1930, and $73,867.64 for the year 1931. Plaintiff's profits on the Buffalo Union Furnace Company bonds to 1930 amounted to $23,823.49 and for 1931, $837,418.85. The plaintiff reported these profits as capital gains and so computed them in his return. The Commissioner of Internal Revenue assessed against the plaintiff an additional income tax of $13,056, with $2,502.10 interest, for the year 1930, and $79,840.82 with $10,510.55 interest for the year 1931. This assessment was paid, and this suit is brought to recover the additional tax so paid.

The first contention of the plaintiff is that the gains in question were impressed with the character of capital gains when the exchange of the original stock was made and that they retained that character thereafter; that the effect of the re-organization provisions of the statute were to postpone taxation of the capital gain on the 1927 exchange. This contention presents a question, so far as I am advised, that has not been passed upon by the courts. It seems to me, however, that it can not be sustained.

The Revenue Act of 1928, Chapter 852, 45 Stat. 791, section 22(e), 26 U.S.C. A. Int.Rev.Acts, page 356, provides: "In the case of a sale or other disposition of property, the gain or loss shall be computed as provided in sections 111, 112, and 113." The last-mentioned sections fix the method determining the amount of the gain, and section 111(a) reads: "The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the basis provided in section 113," 26 U.S.C.A. Int.Rev.Acts, page 376, and such basis is the original cost of the bonds as allocated to the bonds in re-organization. Bonds clearly are property. Definitely the sale or other disposition of them was made in 1930 and 1931, and the government has taxed the amount realized over the basis of value fixed in the re-organization. The basis of each bond in re-organization was fixed by the Commissioner. In arriving at this he made an estimated par or full value of each bond as $1,000. No gain was then realized, and the question whether there would be any gain was not then known. A loss might have been realized. This awaited the time of redemption or other disposition. The basis was fixed to determine later gains or losses and not to preserve the right to capital gain.

"Capital gain" as defined by Revenue Act of 1926 section 208(a), 26 U.S.C. A. Int.Rev.Acts, page 157 and by Section 101(c), Act of 1928, 26 U.S.C.A. Int.Rev. Acts, page 371, means taxable gain from the sale or exchange of capital assets consummated after December 31, 1921. Section 203(a) of the Act of 1926, 26 U.S.C.A. Int.Rev.Acts, page 148, provides, with certain exceptions, that upon the sale or exchange of property the entire amount of gain or loss as determined under section 202, 26 U.S.C.A. Int.Rev.Acts, page 147, shall be recognized. One of such exceptions arises in an exchange in re-organization. Section 203(b) (2). The purposes served by this exception are two—to relieve re-organization from premature taxation and to prevent taking of losses by wash sales. C. H. Mead Coal Co. v. Commissioner, 4 Cir., 72 F.2d 22. The fact,

however, that no gain or loss was then recognized does not deny future recognition, nor, in view of the statute, does it have any bearing on the question of the nature of the bond thereafter.

Plaintiff points to the case of Fairbanks v. United States, 95 F.2d 794, 796, Id., 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855, wherein it is said: "Such redemption is merely the payment of an obligation according to its terms." He says that case is applicable where there was a purchase and redemption of bonds, and not where the bonds were given in exchange for property; and that upon such an exchange, the payment relates back to the time of the exchange. No merit is seen in this contention, because we believe it is immaterial whether the bonds were secured in exchange or by purchase. The test is the "retirement" of the bonds as of the date.

While the precise question has not been presented in any of the reported cases, fairly comparable situations have been. In these the courts have held that the tax, whether ordinary gain or capital tax, was assessable as of the year subsequent to an exchange in re-organization. Among such cases are Gann v. Commissioner, 7 Cir., 61 F.2d 201; certiorari denied, 287 U.S. 650, 53 S.Ct. 97, 77 L.Ed. 562; Buell v. Commissioner, 10 Cir., 106 F.2d 398; W. C. Rands v. Commissioner of Internal Revenue, 34 B.T.A. 1107; Hale v. Commissioner, 66 App.D.C. 242, 85 F.2d 819; Herndon v. Commissioner, 10 Cir., 109 F.2d 1017.

It does not seem to me that any of the cases cited by the plaintiff support his view. Particular stress is placed on Gann v. Commissioner, supra. It is an authority for the proposition that a gain derived from an exchange in one year is taxable when liquidated, but it is not an authority, as I read it, for the claim that liquidation of the bonds in a later year is the "equivalent of the liquidation of the gain at the time of the exchange and was the receipt of the tax payer of the money derived from the exchange in 1927 and hence a capital gain." The character of the gain was not considered in that case. The case on the other hand is consistent with the position of the government that only gains "recognized", that is, taxed in the year exchanged, affect the determination of the gains to be recognized and taxed later when the property received in exchange is ultimately disposed of.

In Hopkinson v. Commissioner, 42 B.T.A. 580, decided August, 1940, plaintiff sold certain patents for which she was paid a certain percent of income from the use of the patents. This case seems to have no relevancy. The court held the transaction was, in effect, an installment sale. It held that the income received was a capital gain under Section 117 of the Act of 1934.

Averill v. Commissioner, 1 Cir., 101 F.2d 644, did not involve any question of a sale or exchange in re-organization. It did involve a straight sale of stock at a fixed price. The transaction was in effect an installment sale. The court did hold that it was a capital gain, but, as pointed out by the authorities, long term bonds are distinguishable from serial bonds as respects the nature of the gain therefrom. The transaction was within Section 212 of the Revenue Act of 1926, 26 U.S.C.A. Int. Rev.Acts, page 162, which permitted the return in any taxable year of the installment payments actually paid in that year bears to the total contract price. The gain so realized was taxable as capital gain under Section 101 of the Act of 1928. The court supports its decision further that the gain was a capital gain by the statement, in effect, that the redemption of the bonds in 1931 amounted to a sale. This last argument was overruled in the Fairbanks case, supra. No comparable point is found in this case.

Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 260, 77 L.Ed. 428, does not discuss the question of whether the gain was taxed as an ordinary or capital gain. The plaintiff there sold stock in one corporation, receiving some cash on the sale and short time notes for the balance. Plaintiff contended that the transaction was exchange for other securities so was exempt from taxation by the Act of 1926. The court definitely repudiated this contention, and, among other things, said: "In substance the petitioner sold for the equivalent of cash; the gain must be recognized." This case points distinction between long time securities and short time notes.

Buell v. Commissioner, supra, and Herndon v. Commissioner, 10 Cir., 109 F.2d 1017, present somewhat comparable facts to those here. In those cases it seems to

have been conceded that under the decision in the Fairbanks case the gain was taxable as an ordinary gain. The Buell case involved an exchange in re-organization in 1930 and call on the bonds in 1931 and 1932. Part of the bonds were called in 1931 and part were called in 1932. Profits in those years were held taxable as ordinary profits. Herndon v. Commissioner, supra, arose out of the same transaction.

■ I conclude, therefore, that the gains of the plaintiff were "realized" by the taxpayer in 1930 and 1931, and therefore are taxable as of such years, and that the redemption did not constitute deferred capital gains realized in full in 1927 and taxable in 1930 and 1931.

■ It is also the contention of the plaintiff that the disposition of the bonds in 1931 amounted to a sale by him to the National Steel Corporation, and hence the receipts therefrom represented capital gain. This question does not arise in reference to the bonds called in 1930. The stipulation definitely states that plaintiff surrendered these upon call. It should be borne in mind that the Act of 1934, Chapter 277, 48 Stat. 680, which provided that the amounts received on the retirement of bonds issued by a corporation "shall be considered as amounts received in exchange", has no application here. Fairbanks v. United States, supra, has settled the law that "capital gain" does not arise from the "redemption" of bonds such as those in question here. See, also, McClain v. Commissioner (Helvering v. Thomson), 61 S.Ct. 373, 85 L.Ed. 319, decided by the Supreme Court, January 6, 1941. Confusion had arisen because the Commissioner until 1929 had held that a capital gain did so arise, and this was later affirmed in Werner v. Commissioner, 15 B.T.A. 482. The latter decision was definitely reversed in Watson v. Commissioner, 27 B.T.A. 463. The court in the Fairbanks case [306 U. S. 436, 59 S.Ct. 608, 83 L.Ed. 855], said: "Payment and discharge of a bond is neither sale nor exchange within the commonly accepted meaning of the words."

It is true that the Commissioner in 1930 assessed as capital gain gain realized on the "retirement" so-called of some 23 bonds in 1928, and at that time held that "Any profit realized later, through the retirement of bonds, is taxable as Capital gain 12½%", but this holding was made in accord with the decision in Werner v. Commissioner, supra, decided in February, 1929, and in accord with prior holding of the Commissioner, but prior to the decision in Watson v. Commissioner, supra, decided in 1932, and, of course, prior to the decision in the Fairbanks case. These latter decisions expressly repudiated the earlier holdings that as said in Werner v. Commissioner "the redemption of [the] bonds constituted a 'sale or exchange' within the meaning of section 206 [42 Stat. 232]." It is unnecessary to seek any difference in meaning between "retirement" and "redemption" in view of the decisions of the Supreme Court. It is quite true that the plaintiff might have made a bona fide "sale or exchange" of these bonds prior to their redemption and then clearly would have been required to pay a capital gain tax, and it well may be that he did not do so by reason of the holding of the Commissioner at that time, but as was said in the McClain case [61 S.Ct. 375, 85 L.Ed. 319]: "We must apply the statute as we find it." The plaintiff contends that the decision in the Fairbanks case does not apply because there was a "sale" and not a "retirement" of the bonds. If that were true obviously the Fairbanks case could have no application.

■ I have hereinbefore set forth stipulated facts which I believe sustain the claim of the government that there was a "redemption" of the plaintiff's bonds and not a sale. A brief recapitulation of such facts may be here made. On April 9, 1931, National Steel Corporation made arrangement with the Mortgage Indenture Trustee to deposit funds sufficient to pay the bonds at the premium price with interest. On the following day plaintiff, with one Baird, who, together with plaintiff, owned about two-thirds of the total bond issue, issued a most complicated statement in which they state that they have "consented to the redemption" of their bonds and in effect advising other bondholders to do likewise. That statement reads:

"To the Bondholders of Buffalo Union Furnace Co.

"The National Steel Co. has acquired the Hanna Furnace Corporation (formerly Buffalo Union Furnace Co.) and desires to pay off your mortgage as an incident to placing a new first mortgage on all its property. M. A. Hanna Company also wish this done. The success of our company was largely due to the punctual and honorable meeting of their engage-

ments and promises, at times extremely onerous, by the Hanna interests. We think we owe them all reasonable co-operation to further their plans. We have, therefore, consented to the redemption of our bonds, about two-thirds of the total issue, upon the premium price fixed by the mortgage, to wit 104. If you agree with us that redemption should be consented to by all bondholders, will you please deposit your bonds with the Trust Department of the M & T Trust Company, Buffalo, New York, against their receipt. A few days will elapse between your deposit and the receipt of your check from the M & T Trust Company, but interest will be computed in your favor from the date of your last coupon (April 1) to the date of payment, so that the delay—not more than two weeks—will cost you nothing. Your prompt attention to the matter will be appreciated by M. A. Hanna Co. The new mortgage, now ready to file, cannot be delivered until our mortgage is discharged. Delay by us, therefore, hampers them in their plans."

On April 17, 1931, the Board of Directors of the Hanna Furnace Corporation (of New York) adopted a resolution that the bonds "be forthwith, or as soon as possible, redeemed and retired." On the same day the Board of Directors of the National Steel Corporation, which then owned all the outstanding stock of the Hanna Furnace Corporation (of New York) acquired by Hanna Furnace Corporation (of Delaware), adopted a resolution that the bonds in question be called for redemption, and the Treasurer was given power to "redeem, retire and pay the same by depositing with the Trustee * * * moneys to pay said bonds." Five days later plaintiff deposited his bonds with the trustee; published notices of redemption were issued by the Hanna Furnace Corporation (of New York) and the trustee; and on April 28, 1931, National Steel paid to the Manufacturers & Traders Trust Company out of its own funds moneys sufficient to take up all of the outstanding bonds, or $4,317,934. On the same day the Trust Company credited to the plaintiff's account in its bank the money paid by National Steel to pay plaintiff's bonds in full at $104, with interest, or $1,048,678. The plaintiff at that time turned into the bank his trust receipt for these bonds and on that day National Steel charged on its books against the Hanna Furnace Company (of New York) the total amount of the moneys paid by it to redeem the bonds at par with interest, and the balance it charged to its own surplus account.

It is true that on the last-above mentioned day National Steel, Hanna Furnace Corporation (of New York) and the Manufacturers & Traders Trust Company, as trustee, entered into a supplemental agreement which permitted the exercise of different options by the bondholders for the payment of their bonds, but this is of no moment. The bonds were called for payment and the bondholders were paid the call price, with interest, or what was taken to be the equivalent of the call price, with interest.

In passing on the objections to a proposed Stipulated Fact No. 50, I held the same to be immaterial. It seems to me that any question as to whether the plaintiff "would agree to surrender" his bonds prior to the time when the "said bonds could be called" does not have any bearing on the question of a "sale or exchange" of the bonds.

It is also contended by the plaintiff that no authority was vested in the trustee by the mortgage to accept payment or to discharge the mortgage; that the bonds were not disposed of pursuant to their terms and that therefore the case does not fall within the rule laid down in the Fairbanks case relating to redemption and retirement of bonds in accordance with their terms. To substantiate plaintiff's claim in this respect attention is called to Article 3 of the mortgage which provides, in substance, that the mortgage "is to be a continuing lien to secure full and final payment of principal and interest * * *"; Article 8 that "Furnace Company covenants and agrees to cause the mortgage to be recorded * * * to secure and protect the security of the bondholders", and also Article 16 which provides that "upon payment when due of all the principal and interest * * * the trustee shall * * * forthwith enter satisfaction of this mortgage upon the records."

No merit is seen in this claim. A creditor may modify his agreement with the debtor, provided in so doing he does not interfere with the rights of other creditors. Each bondholder was required to and did consent to the payment of his bond. The debtor proposed to pay. The

creditor was paid in full. These terms of this mortgage, therefore, are not material. The only case which the plaintiff cites as holding that bond issue must be paid according to its terms is a case in which the rights of other bondholders were prejudiced by payment. Missouri, K. & T. R. Co. v. Union Trust Co., 156 N.Y. 592, 51 N.E. 309. ·

The transactions of 1930 and 1931 amounted to a redemption of the bonds of the plaintiff in the Buffalo Union Furnace Company and, therefore, neither constituted a sale nor an exchange within the meaning of capital gains as defined by Section 101(c) (1) of the Revenue Act of 1928. I, therefore, conclude that defendant is entitled to judgment dismissing the complaint with costs.

In the so-called Supplemental Agreed Statement of Facts, as submitted to the court, objections were raised by the defendant to the admissibility of such as are therein numbered 44 to 56, inclusive, upon the ground that they are incompetent, irrelevant, and immaterial. I have passed on these objections and have noted my holding as to each in a separate memoranda.

Findings of Fact and Conclusions of Law as submitted by the defendant have been signed and approved by me and are to be considered as a part of this opinion.